UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE BEACON ASSOCIATES LITIGATION | No. 09 Civ. 0777 (LBS) |
|---|---|
| IN RE J.P. JEANNERET ASSOCIATES, INC. | Case No. 09 Civ. 3907 (CM) |
| HILDA L. SOLIS, Secretary of the United States Department of Labor,<br><br>                    Plaintiff,<br><br>                    v.<br><br>BEACON ASSOCIATES MANAGEMENT CORP. et. al.,<br>                    Defendants. | No. 10 Civ. 8000 (LBS) (AJP) |
| BOARD OF TRUSTEES OF THE BUFFALO LABORERS SECURITY FUND, et. al.,<br>                    Plaintiffs,<br>                    v.<br><br>J.P. JEANNERET ASSOCIATES, INC., et. al.,<br>                    Defendants. | No. 09 Civ. 8362 (LBS) (AJP) |
| BEACON ASSOCIATES MANAGEMENT CORP.<br>                    Plaintiff,<br>                    v.<br><br>BEACON ASSOCIATES LLC I,<br>                    Defendant. | No. 09 Civ. 6910 (AJP) |
| ERNEST A. HARTMAN et. al.,<br>                    Plaintiffs,<br>                    v.<br><br>IVY ASSET MANAGEMENT L.L.C. et. al.,<br>                    Defendants. | No. 09 Civ. 8278 (LBS) (AJP) |
| STEPHEN C. SCHOTT, as TRUSTEE FOR THE STEPHEN C. SCHOTT 1984 TRUST,<br>                    Plaintiff,<br>                    v.<br><br>IVY ASSET MANAGEMENT CORP., et. al.,<br>                    Defendants. | No. 10 Civ. 8077 (LBS) |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| DONNA M. McBRIDE, individually and derivatively on behalf of Beacon Associates LLC II,<br><br>      Plaintiff,<br>   v.<br><br>KPMG INTERNATIONAL et. al.,<br><br>      Defendants,<br>   -and-<br><br>BEACON ASSOCIATES LLC II,<br><br>      Nominal Defendant. | Index No. 650632/2009E |
| ALISON ALTMAN, et. al.,<br><br>      Plaintiffs,<br>   v.<br><br>BEACON ASSOCIATES MANAGEMENT CORPORATION, et. al.,<br><br>      Defendants. | Index No. 652238/2010 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| | |
|---|---|
| JOEL SACHER and SUSAN SACHER, derivatively on behalf of BEACON ASSOCIATES LLC II,<br><br>               Plaintiffs,<br>           v.<br><br>BEACON ASSOCIATES MANAGEMENT CORP. et. al.,<br>                 Defendants,<br>          -and-<br><br>BEACON ASSOCIATES LLC II,<br>                  Nominal Defendant. | Index No. 005424/2009 |
| CHARLES J. HECHT, derivatively on behalf of ANDOVER ASSOCIATES LLC I,<br><br>               Plaintiff,<br>           v.<br><br>ANDOVER ASSOCIATES MANAGEMENT CORP. et. al.,<br>                 Defendants,<br>          -and-<br><br>ANDOVER ASSOCIATES LLC I,<br>                  Nominal Defendant. | Index No. 006110/2009 |
| THE JORDAN GROUP LLC, derivatively on behalf of BEACON ASSOCIATES LLC I,<br><br>               Plaintiff,<br>           v.<br><br>BEACON ASSOCIATES MANAGEMENT CORP. et. al.,<br>                 Defendants,<br>          -and-<br><br>BEACON ASSOCIATES LLC I,<br>                  Nominal Defendant. | Index No. 003757/2011 |

CIRCUIT COURT OF THE STATE OF FLORIDA
FIFTEENTH JUDICIAL CIRCUIT, PALM BEACH COUNTY

| | |
|---|---|
| HARVEY GLICKER, et. al.,<br><br>                Plaintiffs,<br>        v.<br><br>IVY ASSET MANAGEMENT CORP., et. al.,<br>                Defendants, | Court File No.<br>502010CA029643 XXXX MBAB |

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| JOEL T. GLUCK,<br><br>      Claimant,<br>   v.<br><br>BEACON ASSOCIATES LLC II et. al.,<br>       Respondents, | AAA No. 19 435 00120 10 |

**MEMORANDUM OF LAW IN OPPOSITION TO PRIVATE PLAINTIFFS'
MOTION FOR AWARDS OF ATTORNEYS' FEES AND EXPENSES**

On the Brief:
  Arthur G. Jakoby, Esq.
  Leah Kelman, Esq.

**HERRICK, FEINSTEIN LLP**
2 Park Avenue
New York, New York  10016
(212) 592-1400
*Attorneys for*
*Beacon Associates LLC I,*
*Beacon Associates LLC II*
*Andover Associates LLC I and*
*Andover Associates QP LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................1

STATEMENT OF RELEVANT PROCEDURAL HISTORY ................................................2

ARGUMENT .........................................................................................................................12

    POINT I.       THE STANDARD OF REVIEW FOR CLASS COUNSEL
                      FEES AND EXPENSES ....................................................12

    POINT II.      PRIVATE PLAINTIFFS' COUNSEL CONFERRED A
                      LIMITED BENEFIT ON THE CLASS .............................13

    POINT III.     THE GOLDBERGER FACTORS WEIGH AGAINST
                      CLASS COUNSELS' APPLICATION ..............................18

        A.      There was No "Risk of Litigation"......................................19

        B.      The Case Did Not Present Novel Issues..............................21

        C.      Time and Labor Expended by Counsel was Excessive .......22

        D.      Fee Request is Disproportionate to the Benefit Conferred..................24

        E.      Public Policy Favors Maximum Recovery to the Class Itself.............25

        F.      Class Counsel Provided Quality Representation But Did Not
              Achieve Extraordinary Results.............................................26

        G.      Lodestar Cross-Check is Unreliable ...................................26

    POINT IV.    CLASS COUNSEL ARE NOT ENTITLED TO THE EXPENSE
                      REIMBURSEMENTS SOUGHT .....................................27

CONCLUSION .....................................................................................................................28

**FEDERAL CASES**

Beane v. Bank of N.Y. Mellon, No. 07 Civ. 09444(RMB), 2009 WL 874046
(S.D.N.Y. Mar. 31, 2009) .............................................................................. 24

Blum v. Stenson, 465 U.S. 886 (1984) ................................................................... 13

City of Detroit v. Grinnell Corp., 560 F.2d 1093 (2d Cir. 1977) .......................... 25

Fears v. Wilhelmina Model Agency, No 02 Cv 4911(HB), 2009 WL 2958396,
315 Fed. Appx. 333 (2d Cir. 2009) ............................................... 22, 24, 26

Goldberger v. Integrated Res., Inc., 209 F.3d 43
(2d Cir. 2000) ........................................... 12, 13, 14, 17, 18, 19, 24, 25, 26

Guippone v. BH S & B Holdings, LLC, et al., No. 09 Civ. 01029(CM), 2011
WL 5148650 (S.D.N.Y. Oct. 28, 2011) .............................................. 14, 25

Hall v. Children's Place Retail Stores, Inc., 669 F. Supp. 2d 399 (S.D.N.Y. 2009) ............. 21

In re AOL Time Warner Shareholder Derivative Litig., No. 02 Civ. 6302(CM), 2010
WL 363113 (S.D.N.Y. Feb. 1, 2010) .......................................................... 22

In re Bausch & Lomb, Inc. Sec. Litig., 183 F.R.D. 78 (W.D.N.Y. 1998) ....................... 21, 23

In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229 (S.D.N.Y. 2005) ..................... 21

In re Dreyfuss Aggressive Growth Mut. Fund Litig., No. 98 CV 4318 HB,
2001 WL 709262 (S.D.N.Y. June 22, 2001) ............................................... 21

In re Elan Sec. Litig., 385 F. Supp. 2d 363 (S.D.N.Y. 2005) ................................. 20

In Re Flag Telecom Holdings, Ltd. Sec. Litig., No. 02-cv-3400(CM)(PED),
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .............................................. 27

In re First Databank Antitrust Litig., 209 F. Supp. 2d 96 (D.D.C. 2002) .............................. 16

In re Gulf Oil/Cities Serv., 142 F.R.D. 558 (S.D.N.Y. 1992) ................................. 25

In re KeySpan Corp. Sec. Litig., No. 01 CV 5852 (ARR), 2005 WL 3093399
(E.D.N.Y. Sept. 30, 2005) ........................................................................... 26

In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144(CM),
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................ 13

In re Painewebber Ltd. P'ships Litig., 94 Civ. 8547 (SHS), 2003 WL 21787410
  (S.D.N.Y. Aug. 4, 2003) ................................................................................ 24

In re Painewebber Ltd. P'ships Litig., 999 F. Supp. 719 (S.D.N.Y. 1998) .......................... 20

In re Prudential Ins. Co., 148 F.3d 283 (3d Cir. 1998) .......................................... 15

In re Renaissance Holdings Ltd. Sec. Litig., 05-Civ. 6764(WHP), 2008 WL 236684
  (S.D.N.Y. Jan. 18, 2008) ................................................................................ 20

In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................... 12

In re Top Tankers, Inc. Sec. Litig., No. 06 Civ. 13761(CM), 2008 WL 2944620
  (S.D.N.Y. July 31, 2008) ............................................................................ 13, 25

Jermyn v. Best Buy Stores, No. 08 Civ. 214 (CM), 2011 WL 280798
  (S.D.N.Y. Jan. 18, 2011) ................................................................................ 22

Johnson v. Brennan, No. 10 Civ. 4712 (CM), 2011 WL 4357376
  (S.D.N.Y. Sept. 16, 2011) ............................................................................... 26

Meridian Horizon Fund LP, et al., v. KPMG, 487 Fed. Appx. 636
  (2d Cir. July 10, 2012) ...................................................................................... 7

New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136
  (2d Cir. 1983) ........................................................................................ 23, 24

Newman v. Family Mgmt. Corp., 748 F. Supp. 2d 299
  (S.D.N.Y. 2010) .............................................................................................. 8

Ramos v. Patrician Equities Corp., No. 89 Civ. 5370 (TPG),
  1993 WL 58428 (S.D.N.Y. March 3, 1993) ....................................................... 14, 16

Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261 (D.C. Cir. 1993) .................................... 15, 16

Velez v. Novartis Pharm. Corp., No. 04 Civ. 09194(CM), 2010 WL 4877852
  (S.D.N.Y. Nov. 30, 2010) ............................................................................. 12, 19

## MISCELLANEOUS

Fed. R. Civ. Proc. 23(h) ............................................................................ 12, 13

FRE 408 ................................................................................................... 4

<u>**PRELIMINARY STATEMENT**</u>

Beacon Associates LLC I and Beacon Associates LLC II (collectively, "Beacon") and Andover Associates LLC I and Andover Associates QP LLC (collectively "Andover" or, together with Beacon, the "Funds") submit this memorandum in opposition to Private Plaintiffs' Motion for Awards of Attorneys' Fees and Expenses.

The Consolidated Settlement now before this Court arises from the most spectacular financial scam of the past decades. In December 2008, Bernard L. Madoff ("Madoff") confessed to running a massive Ponzi scheme in connection with which all (or substantially all) of the money invested with Madoff had been lost. The Madoff scandal precipitated a flurry of legal activity that sought to hold those involved in Madoff's scam responsible for any wrongdoing. This Consolidated Settlement for $219,857,694 resolves claims asserted by class plaintiffs, derivative and individual plaintiffs, the Beacon and Andover Funds, the Department of Labor ("DOL") and the Office of the New York State Attorney General ("NYAG").

It should be initially noted that the Funds do not oppose, in any respect, the terms of the Settlement and Plan of Allocation, preliminarily approved by this Court on November 30, 2012. For the reasons set forth in Private Plaintiffs' moving papers, final approval of the settlement and plan of allocation should be ordered. The Funds, however, vigorously oppose Private Plaintiffs' Counsels' application for **$40,771,538.00** in attorneys fees and **$1,213,292.58** in expenses because the nearly $41 million in fees is approximately 50% of the <u>maximum</u> benefit conferred by Class Counsel to the common fund and such an award would not only unfairly reward Class Counsel for the work of others, but it would unjustly diminish the class members' recovery.

The touchstone of class counsel attorneys' fees is reasonableness. In light of the procedural history and evolution of this consolidated action, there are multiple reasons why the

Private Plaintiffs' attorney fee application for approximately $41 million — approximately 18.5% of the entire common fund, but more than 50% of the value added to the fund by Class Counsel — is patently unreasonable. Private Plaintiffs' counsel should, of course, be awarded for the benefit they conferred upon the class. Indeed, the Funds do not contest the fact that Class Counsel skillfully advocated for the class and played a role in forging this settlement. The monetary benefit that Class Counsel conferred upon the class, however, was limited to, at most, the difference between the $219.8 million settlement that is now moving toward finalization and the $140 million settlement that Defendant Ivy Asset Management was ready, willing and able to consummate with the NYAG prior to the class actions ever arriving on the scene. Private Plaintiffs' counsel should not receive a windfall based upon the work of other parties and the benefit conferred by others.

## STATEMENT OF RELEVANT PROCEDURAL HISTORY

In December 2008, Bernie Madoff was arrested and exposed as a fraud; the facts of his demise are well known. Immediately thereafter, on January 27, 2009, the first of many litigations, now all consolidated under the caption In re Beacon Associates Litigation, 09 Civ. 0777 (S.D.N.Y.) was filed. The complaint was a generic class action complaint alleging violations of securities laws, claims under ERISA, and direct and derivative common law claims. [Civil Action No. 09 Civ. 00777 Document 1]. Specifically, the plaintiffs alleged that Beacon Associates Management Corp., Joel Danziger, Harris Markoff, Ivy Asset Management Corp., the Bank of New York Mellon Corp., and Friedberg Smith & Co., P.C. (collectively "Original Defendants") invested and allowed investments with Madoff "without performing adequate due diligence despite the existence of obvious 'red flags'." Id. ¶ 5. The January 27, 2009 complaint contained only 39 conclusory substantive fact allegations — devoid of any specificity in the

pleadings. Jakoby Decl.[1] ¶ 3. On May 13, 2009, Judge Sand entered a Consolidation Order that consolidated related cases <u>Cacoulidis v. Beacon Associates Management Corp., et al.</u>, 09 Civ. 0777 (LBS), <u>Raubvogel v. Beacon Associates LLC I, et al.</u>, 09 Civ. 2401 (LBS), and <u>Plumbers Local 112 Health Fund v. Beacon Assoc. Manag. Corp., et al.</u>, No 09 Civ. 3202 under the caption <u>In re Beacon Assoc. Litig.</u>, Master File No. 09 Civ. 0777 (LBS). The related consolidated action of <u>In re J.P. Jenneret Associates Inc.</u>, 09 Civ. 3907 remained pending before this Court. Lowey Dannenberg was appointed Lead Counsel and additional plaintiffs' counsel were later added (collectively, "Class Counsel"). Jakoby Decl. ¶ 4.

On October 1, 2009, all of the class plaintiffs filed a single Consolidated and Amended Class Action Complaint ("CAC") in <u>In re Beacon</u>. The CAC included 143 substantive fact allegations essentially claiming that defendants "*knew or should have known*" about Madoff's sham, but still devoid of any particularity. [Civil Action No. 09 Civ. 00777 Document 67]. Jakoby Decl. ¶ 5. In December of 2009, Defendants filed Motions to Dismiss the CAC based upon the fact that the allegations were devoid of any particularity and that allegations relying solely upon missed "red flags" are insufficient, as a matter of law, to sustain the allegations. Just when those motions were fully briefed and ripe for consideration, the NYAG sued financial services firm Ivy Asset Management Corp. ("Ivy") and related defendants in New York state court. <u>People v. Ivy Asset Manag., et al.</u>, Index No. 450489/2010, Supreme Court of New York, County of New York (May 11, 2010) ("NYAG Cmplt."). Jakoby Decl. ¶ 6.

Detailed, specific, and particular allegations of Ivy's actual fraud — not just bald and conclusory allegations — were provided in the NYAG's complaint, filed on May 11, 2010 in the

---

[1] "Jakoby Decl." shall refer to the Declaration of Arthur G. Jakoby, Esq. In Opposition to Private Plaintiffs' Motion for Awards of Attorneys' Fees and Expenses, dated February 8, 2013, and submitted herewith.

Supreme Court of New York.  Jakoby Decl. ¶ 7.  The lawsuit was a result of the NYAG's extensive investigation, which began in April 2009, shortly after the Madoff fraud was discovered, into Ivy's due diligence of Madoff and whether Ivy properly informed its investment clients of the concerns it developed concerning the propriety of Madoff's investment strategies. The investigation uncovered incontrovertible evidence that the Ivy Defendants intentionally concealed from its investment clients, as alleged by the NYAG, that it knew in uncertain terms that (1) there were insufficient options available to support Madoff's split-strike strategy either on the exchanges or over the counter and that Madoff therefore could not be executing the split-strike strategy he purported to be executing;  NYAG Cmplt. ¶ 81, (2) Madoff was misappropriating client money; Id., (3) the returns Madoff was reporting were false;  Id. ¶ 56, (4) an Ivy Co-Principal had recommended total withdrawal of Ivy's position with Madoff in late 1998; Id. ¶ 67, (6) Ivy elected, in 2000, to withdraw all of its own investment from Madoff but had lied to its clients about the reason for withdrawal;  Id. ¶ 104-105, and (7) Ivy's risk committee had listed Madoff as one of Ivy's ten top risks.  Id. ¶ 122.  The reason, of course, as set forth in the NYAG  complaint, for Ivy's alleged fraud was that Ivy knew that exposing Madoff would tell the end of the hefty advisory fees that Ivy was collecting on Madoff purported returns.  Jakoby Decl. ¶ 8.

Prior to filing the civil complaint in May of 2010, and as a result of the evidence compiled by the NYAG against Ivy, Ivy — under pressure from the threat of being sued by the NYAG — agreed to engage in settlement discussions with the NYAG in February 2010.  The NYAG consulted with counsel for the Funds in April and early May of 2010 concerning certain aspects of a potential $140 million settlement and potential settlement papers were drafted and reviewed by Ivy and counsel for the Funds.  Jakoby Decl. ¶ 9.  Counsel for the Funds also met

with or spoke with counsel for the various defendants in the class actions to discuss certain aspects of the proposed $140 million settlement.[2]  Id.  Ivy was ready, willing, and able to finalize a $140 million dollar settlement on terms that, among other things, would secure a global settlement and release of all claims by investors in Beacon, Andover, Income Plus or directly in Madoff and all claims by Beacon, Andover and Income Plus and provide for judgment reduction with respect to claims against the managers of those Funds.  Despite Ivy's willingness to pay $140 million the parties were unable to come to an agreement on that settlement.  The NYAG, therefore, ultimately filed its state action against Ivy and its co-founders Lawrence Simon and Howard Wohl (collectively, "the  Ivy Defendants"), setting forth in detail — based on actual emails and testimony — alleging that Ivy perpetrated a fraud on its investment clients.  Jakoby Decl. ¶ 10.

It is undisputed that the NYAG's complaint, developed from a nearly yearlong investigation, 30 document and information requests to fourteen entities, 37 depositions, and review of more than 11 million pages of discovery — all of which comprised less than 5,700 hours of attorney time — provided a detailed roadmap of Ivy's alleged fraud and laid out plain evidence of sustainable claims against Ivy.  See Jakoby Decl. ¶ 8.  The NYAG's complaint contained 100 specific fact allegations, based on e-mails and testimony.  For example, the NYAG complaint alleged that in 1997, Ivy noticed that there were insufficient Standard & Poor's 100 Index options ("OEX") traded on the Chicago Board Options Exchanges to support the option trades Madoff purported to be making.  NYAG Cmplt. ¶ 11.  Further, the NYAG Complaint alleged that when Ivy's Chief of Investment Management contacted a hedge fund

---

[2]      Notwithstanding FRE 408 counsel for Ivy and BNY has authorized counsel for the Funds to disclose the settlement discussions and the amount offered by Ivy in April 2010 to settle the NYAG's and the Funds' claims.

manager and raised this concern, the manager explained to the Chief of Investment Management that the Madoff returns pointed to "a managed income stream." Id. ¶ 15.  When the Chief of Investment Management further investigated, he learned that Madoff stated he traded 917 OEX calls on a day that Bloomberg reported only 578 OEX were traded and that the price Madoff reported was well below the exchange trade prices reported by Bloomberg.  In a memo, he wrote: "[t]his is a clear example of our inability to make sense of Madoff's strategy, and one where his trades for our accounts are inconsistent with the independent information that is available to us." Id. ¶ 16.  Based on these concerns, in 1998, Wohl wrote:

> I'm concerned that
>> he [Madoff] now admits that he does not execute all of the index options on the exchange that there are 'unknown' counterparties that if these options are not paid off he'd lose less than 100%. It remains a matter of faith based on great performance -- this doesn't justify any investment, let alone 3%.

NYAG Cmplt. ¶ 75; Jakoby Decl. ¶ 8.

1.      Moreover, the NYAG investigation uncovered a 1998 email from Ivy's Chief of Investment Management recommending that Ivy terminate Madoff investments for the Ivy Funds and write to the advisory clients, provide an explanation of the decision to terminate Madoff investments, and allow clients to make their own decision about withdrawal — he called this a "middle of the road approach" that would legally protect them, at least partially, "should the worst happen." NYAG Cmplt. ¶ 70.  Ivy did not take this course of action, and the NYAG complaint demonstrates how the alleged deception continued for another ten years. And, in an email dated April 1, 2002, Wohl responded to a subordinate's attempt to analyze Madoff's consistent success by writing, "Ah Madoff.  You omitted one other possibility - he's a fraud!" NYAG Cmplt. ¶ 113.

Recognizing the opportunity to save the consolidated class action claims from dismissal for failure to state cognizable claims with the requisite specificity, motions which were already briefed, argued and pending before Judge Sand, class plaintiffs quickly amended their consolidated complaint by reciting the NYAG's allegations and indeed citing directly to the NYAG complaint, nearly paragraph by paragraph. Jakoby Decl. ¶ 11. In their Second Amended Complaint ("SAC"), class plaintiffs lifted allegations and quotes directly from the NYAG complaint and cited to evidence they had never seen, but that the NYAG had uncovered during its yearlong investigation and relied on in its state action complaint. [Civil Action No. 09 Civ. 00777 Document 126]. Specifically, all of the particularity added to the SAC, and the new allegations that the Ivy Defendants actually knew Madoff was a fraud and that they intentionally lied to their investors to protect their fees, was uncovered by the NYAG investigation, disclosed in the NYAG's state action complaint, and then copied by the class plaintiffs and alleged by class plaintiffs in the SAC. Jakoby Decl. ¶ 11.

After granting permission to renew the already pending motions to dismiss, Judge Sand denied, in large part, Defendants' motions to dismiss the Second Amended Class Complaint. [Opinion and Order, Civil Action No. 09 Civ. 00777 Document No. 181].[3] Remarkably, Judge Sand ignored the original allegations in the CAC and cited directly to the NYAG complaint — a complaint filed in state court, and not before Judge Sand — when he sustained the majority of class plaintiffs' claims. Jakoby Decl. ¶ 12. It is clear that without the NYAG's investigation and complaint, the class plaintiffs' claims were unsustainable and likely to be dismissed, as numerous other complaints filed against Madoff feeder funds, alleging that the funds ignored 'red flags', were all dismissed. Jakoby Decl. ¶ 13; e.g., In re J.P. Jeanneret Assoc., Inc., et al., 09

---

[3]        All of Plaintiffs' state law claims and some federal claims were dismissed.

Civ. 3907 (CM), Decision and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss the Second Amended Class Action Complaint, p. 36 [Case 1:09-cv-03907-CM-AJP Document 215] (Jan. 31, 2011) ("As has been true in other cases, the existence of 'red flags' does not satisfy the scienter requirement."); Meridian Horizon Fund LP, et al., v. KPMG, 487 Fed. Appx. 636, at *3 (2d Cir. July 10, 2012) ("plaintiffs' allegations that the Auditors ignored "red flags" of Madoff's fraud and conducted an inadequate audit of the Tremont funds were insufficient to support a strong inference of scienter"); Newman v. Family Mgmt. Corp., 748 F. Supp. 2d 299 (S.D.N.Y. 2010) (Sand, J.) (rejecting plaintiffs red flag theory and dismissing the complaint).

After the respective motions to dismiss were denied, the parties proceeded with discovery. Five lawsuits were assigned to Honorable Andrew J. Peck for the coordination of discovery. They are In re J.P. Jeanneret Associates Inc., No. 09 Civ. 3907 ("In re Jeanneret") brought against Dr. John Jeanneret, JPJA, Paul Perry alleging federal securities and ERISA claims on behalf of those who invested with Madoff through JPJA; Buffalo Laborers Sec. Fund v. J.P. Jeanneret Assoc., Inc., et al., No. 09 Civ. 8362 ("Buffalo Laborers"), which pursues ERISA claims on behalf of the class of investors who invested directly with Madoff through JPJA; Hartman v. Ivy Asset Management, et al., No. 09 Civ. 8278 ("Hartman") which is essentially an opt-out group of investors pursing ERISA claims of investors who invested directly with Madoff through JPJA; and Solis v. Beacon Assoc. Manag. Corp., No. 10 Civ. 8000 ("Solis"), filed by the Department of Labor ("DOL") which also pursues the ERISA claims of investors who invested with Madoff. These actions, as well as other related actions, are all part of this Consolidated Settlement. Jakoby Decl. ¶ 14.

Prior to this consolidated action, however, the Ivy Defendants as well as the other Original Defendants had produced over 14 million pages of discovery to government regulators — NYAG, the Securities and Exchange Commission and the Department of Labor (the "NYAG Document Production"). To streamline discovery, Magistrate Judge Peck ordered that the Original Defendants reproduce the NYAG Productions to the Plaintiffs. Thus, Plaintiffs gained access to the 14 million pages of documents previously produced to regulators as of December 21, 2010. Jakoby Decl. ¶ 15, Ex. A. p. 6.

Approximately two months later, the parties convened before Magistrate Judge Peck for a status conference. On March 2, 2011, Lead Plaintiffs' Counsel informed Magistrate Judge Peck that Private Plaintiffs were about to embark on their review of millions of pages of discovery, which had already been combed through by the NYAG and which had served as the factual basis for the NYAG complaint (as well as the allegations which were copied into the SAC). Jakoby Decl. ¶ 16. At that hearing, counsel for the Funds raised the concern that the collective billing rate of all the class action / derivative plaintiff attorneys at $15,000 to $20,000 an hour and the copious amounts of impending discovery would only diminish the investors' recovery. Jakoby Decl. Ex. B at 16:12-19:10. He had, therefore, been in contact with many of the parties who, in fact, expressed a willingness to mediate, but each was reluctant to be the first to suggest mediation. Id. Funds' counsel then asked the court to facilitate mediation and specifically noted that the sooner the actions settled, the more money will go into investor pockets. Counsel for the Funds explained:

> Moreover, your Honor, in most cases at this point of the litigations or litigation, not much is known about the allegations, about the e-mails, about the evidence. You will [normally] have to ferret [it] out and pull it out during discovery. Here the Attorney General's Office met with all of the defendant parties, either got testimony or written statements, looked through all the 14 million e-mails and

> documents and drafted a huge complaint that is now being used in
> this action.  So I think we'll all assume the Attorney General did a
> very good job looking through the e-mails, deposing all the parties,
> **and now to just repeat it again and spend millions of dollars**
> **doesn't seem to be very good for the investors,** your Honor.

Jakoby Decl. ¶ 18; Ex. B at 18:19-19:5 (Bold emphasis added).[4] So, in March 2011, the first

seeds of mediation were sown.  The plaintiffs were put on notice that it was the Funds' position

that (i) there was no need for them to redo all of the work done by the NYAG and (ii) the

defendants were willing to mediate their claims.  Id. at 16:25 - 18:9.  Nonetheless, the plaintiffs

went on to spend thousands of hours re-reviewing the same exact 14 million documents already

reviewed an analyzed by the NYAG and other government regulators, and the mediation did not

commence for another year, and the settlement in which the Ivy Defendants agreed to pay $210

million and Beacon and Jeanneret Defendants agreed to pay the balance was not reached until

Spring of 2012.[5]  Jakoby Decl. ¶ 19.

At many subsequent conferences with Magistrate Judge Peck counsel for the Funds

repeatedly advised the Court of his efforts to get the parties into mediation.  Jakoby Decl. ¶ 20.

Unfortunately, during the interim year, as counsel for the Funds warned in March 2011,

---

[4]     Due to the fact that the Ivy $140 million offer was part of settlement negotiations, counsel for the Funds was not able to disclose, at that time, to either the class plaintiffs or the Court that Ivy was willing to pay at least $140 million to settle all claims. However, the fact that these claims were being pursued by two government regulators and that there was no need to re-review 14 million documents -- or at a minimum, that the benefit to the class of re-reviewing over 14 million documents was minimal --  should have been patently obvious to Class Counsel.

[5]     Although as part of the settlement the Beacon Defendants waived any and all claims to receive management fees from the Beacon Funds and Andover Fund, including without limitation, any claims for accrued or unpaid management fees owed by the Beacon Funds or Andover Fund, those monies were held by the Funds and even before the mediation, counsel for the Beacon Defendants agreed that as part of a settlement they were going to give up their "accrued but unpaid fees."  Thus, although the plaintiffs are seeking full credit for the approximate $3.4 million of accrued by unpaid management fees it was inconceivable that the already withheld fees were going to be paid to the Beacon and Andover Defendants.

thousands of hours and millions of dollars of attorneys fees and costs were unnecessarily incurred[6] — needlessly re-reviewing the millions of pages of documents previously culled through and carefully analyzed by the NYAG thus wastefully repeating work that had already been done and collecting evidence that had already been identified. Simply put, there was no need to redo all of the work already done by others. Jakoby Decl. ¶ 20.

At the mediation which finally commenced in 2011, counsel for the Funds presented a Mediation Memorandum of Law, made an opening statement detailing the facts of the claims against all defendants, and knowing full well of the $140 million settlement offer by Ivy, why we could never agree to anything but a settlement which would make the investors more or less whole. Counsel for the Funds attended every single mediation session, along with the NYAG, the DOL and the private plaintiff counsel. The NYAG, at all times, knowing about the prior $140 million settlement offer took a lead role in all of the negotiations and at fully and completely represented the interests of all of the investors who are beneficiaries of the current settlement. Jakoby Decl. ¶ 21.

Class Counsel now moves this court for $41 million in attorneys fees. Indeed, if Class Counsel were to be awarded $41 million in fees and over one million dollars in expenses, the net settlement fund for the benefit of the investors — after three years of litigation — would be valued at $165 million — *only $25 million more than the $140 million settlement offered by Ivy approximately three years ago*. Class Counsels' fee request is therefore clearly unreasonable and excessive because (1) the benefit Class Counsel yielded for the class was an absolute maximum

---

[6]     Because Class Counsel has not given a breakdown of the time incurred -- a significant flaw of their fee request -- it is not possible to know precisely what portion of their fee request represents their re-review of the 14 million pages of regulatory production. Nonetheless, based upon the information provided, it does appear that the re-review is a significant portion of the total fee request.

of $79,857,694 million; (2) a roadmap for this litigation was available and there was little attendant risk for Class Counsel in bringing these lawsuits; and (3) the <u>Goldberger</u> factors weigh against approval of the fee application.

<b><u>ARGUMENT</u></b>

<b>POINT I.</b>

<b>THE STANDARD OF REVIEW FOR<br><u>CLASS COUNSEL FEES AND EXPENSES</u></b>

In a class action, the Court may award reasonable attorneys fees and expenses. <u>See</u> Fed. R. Civ. Proc. 23(h). It is well established law of this Circuit that a reasonable class attorneys' fee may be calculated either as a percentage of the recovery or the lodestar based upon the number of hours reasonably billed. <u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43, 47 (2d Cir. 2000). This Court, however, has favored the percentage method, although the lodestar amount is generally useful as a cross-check to test the propriety of an award based on the percentage of recovery. <u>In re Telik, Inc. Sec. Litig.</u>, 576 F. Supp. 2d 570, 586, 588 (S.D.N.Y. 2008) (<u>quoting Goldberger</u>, 209 F.3d at 50). <u>Goldberger</u> remains the gold standard for evaluating the reasonableness of class counsel fee applications.

In <u>Goldberger</u>, the Second Circuit emphasized several fundamental principles of class attorneys' fees. First, no matter the method, the Court has a responsibility to class members to ensure that the class counsel fees are reasonable in light of the settlement achieved. <u>Goldberger</u>, 209 F.3d at 47. Indeed, attorneys fees must be reasonable "under the circumstances" of a particular case. <u>Velez v. Novartis Pharm. Corp.</u>, No. 04 Civ. 09194(CM), 2010 WL 4877852, at *17 (S.D.N.Y. Nov. 30, 2010) (McMahon, J.). Second, the lodestar method is flawed because it creates a temptations for lawyers to run up hours billed and is also a disincentive for early settlement. <u>Goldberger</u>, 209 F.3d at 48. Moreover, the lodestar may be

12

unreliable when counsel can simply spend far too many hours on a matter.  In re Top Tankers, Inc. Sec. Litig., No. 06 Civ. 13761(CM), 2008 WL 2944620 (S.D.N.Y. July 31, 2008) (McMahon, J.).  Third, under the common fund doctrine, counsel shall "earn a reasonable fee based on a percentage of the fund bestowed on the class."  Goldberger, 209 F.3d at 49 (citing Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984)).  And fourth, unwarranted windfalls for attorneys should be prevented.  Goldberger, 209 F.3d at 49.

No matter the method used to calculate attorneys' fees, reasonableness is paramount. Reasonableness is evaluated based upon: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  Goldberger, 209 F.3d at 50.  "In applying these criteria, 'a Court essentially makes no more than a qualitative assessment of a fair legal fee under all the circumstances of the case.'"  In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144(CM), 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) (McMahon, J.)  What constitutes a reasonable fee is, indeed, in the sound discretion of the Court.  Guippone v. BH S & B Holdings, LLC, et al., No. 09 Civ. 01029(CM), 2011 WL 5148650, at *8 (S.D.N.Y. Oct. 28, 2011) (McMahon, J.).

In addition to attorneys fees, it is also well established that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses.  See Fed. R. Civ. Proc. 23(h).

### POINT II.

### PRIVATE PLAINTIFFS' COUNSEL
### CONFERRED A LIMITED BENEFIT ON THE CLASS

Based on the circumstances of this case, Class Counsel's fee application for approximately 18.5% of the entire $219.8 million common fund, or 20% of the common fund

after deducting payments to regulators and fund management fees, is manifestly unreasonable. Indeed, as this Court recently noted, "[c]ounsel for a class is entitled to be paid a fee out of the common fund **created for the benefit of the class**." Guippone, 2011 WL 5148650, at *8 (McMahon, J.) (emphasis added). In this case, Class Counsel have provided only a limited benefit to the class; therefore, fairness and equity demands their fee as a percentage of the common fund shall be limited to a percentage of the benefit they conferred upon the class — an absolute maximum of $79 million. In their moving papers, Private Plaintiffs' Counsel "respectfully submit" that a percentage of the entire common fund would "not in any way constitute a "windfall". Br. p. 17. Considering the limited contribution to the class settlement, it is apparent that a fee as a percentage of the entire common fund would actually result in an exorbitant windfall for Class Counsel. Such a result is unjust and unsupportable under the well-established law of this Circuit. See Goldberger, 209 F.3d at 50.

Class Counsel argue that their fee request must be reasonable because they made significant concessions by competing with other law firms for the positions as Lead Plaintiff's Counsel, consented to a fee cap, and agreed not to seek fees on proposed payments to the DOL ($7,000,0000) and NYAG ($5,000,000). The fallacy in their argument, however, is that their purported concessions do not lead to a finding of reasonable fees. This case is different from the plethora of class counsel fee applications that this Court has approved because, in this case, the entirety of the common fund is <u>not</u> a result of class counsels' work to bring this litigation.

When class counsel is only responsible for a portion of the common fund, the fee calculation should be based on the part of the fund for which class counsel is responsible. See Ramos v. Patrician Equities Corp., No. 89 Civ. 5370 (TPG), 1993 WL 58428, at *8 (S.D.N.Y. March 3, 1993) (rejecting class counsel's request for $2,316,546 in fees and awarding $701,370,

when the court found that "much of the ultimate benefit of the settlement to the class resulted from the efforts of others than Plaintiff class counsel"); see In re Prudential Ins. Co., 148 F.3d 283, 338 (3d Cir. 1998) (where federal and state agencies have conducted their own investigation of wrongdoing, it is crucial that the court credit class counsel with only the benefit of the settlement created by class counsel); Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261 (D.C. Cir. 1993) (recognizing that class counsel was responsible only for the difference of the settlement fund from the amount originally on the table).

Swedish Hospital is instructive. In Swedish Hospital several hospitals filed lawsuits contesting what was known as the "photocopying rule" which prohibited Medicare reimbursements for costs hospitals incurred in furnishing photocopies of medical records to peer review organizations. Id. at 1263. Shortly before trial, the parties settled for $27.8 million. The District Court awarded class counsel a 20% rate but concluded that the class counsel could only claim credit for enhancing the fund to $.07 a photocopy page from $.0498 per page which was already on the table when negotiations opened. Id. at 1263-64. The court recognized that class counsel was responsible only for the difference of the settlement fund from the amount originally on the table. Id. at 1264. The fee calculation was also based in part of the fact that plaintiffs had piggybacked on the success of a prior action and that plaintiffs counsel never risked the possibility of zero recovery because the illegality of the photocopying rule had already been determined in a prior action. Id. at 1264. Likewise, in this case, Class Counsel is only entitled to a percentage of the enhancement of the settlement fund that is attributable to their efforts. Here, $140 million was already on the table before the class plaintiffs entered settlement negotiations. Class Counsel assisted and contributed toward increasing the settlement to $219.8; they are therefore, at most, entitled to a percentage of the portion of the $79.8 million difference, which

reflects the benefit that Class Counsel helped confer upon the class, less the benefit attributable to the DOL's, NYAG's, and the Funds' continued participation in the action and mediation.

In re First Databank Antitrust Litig., 209 F. Supp. 2d 96 (D.D.C. 2002) is similarly on point. In First Databank, the FTC had conducted extensive investigation of defendants, two principal vendors of integratable drug information databases, for violations under the Clayton and Federal Trade Commission Acts and had "made its case in advance of filing suit." Id. at 97. One week after the FTC filed the suit, defendants sought to settle with the FTC and offered $18 million — $16 million constituting profit disgorgement. One week later, the first of later consolidated private class actions, alleging damages based upon substantially the same misconduct alleged in the FTC suit, was filed. The private actions then proceeded toward settlement "in tandem" with the closure of the FTC case. After the FTC case and the private actions settled, class counsel sought a 22% fee of the entire $24 million disgorgement amount. The FTC objected and argued that class counsel's fee award should be based on the percentage of the value added to the common fund that is attributable to class counsel's efforts — at most, $8 million. The court agreed and awarded attorneys fees based on the value added — $8 million reasoning that class plaintiffs benefited from the FTC's substantial efforts to establish liability and that a settlement was already on the table before the class actions were even filed. Id. at 101.

Swedish Hospital and First Databank are persuasive, but this Court need not look beyond case law of its own district to find that Class Counsel are only entitled to a fee based on the value they added to the settlement. In Ramos, the court considered the joint fee application of Plaintiffs' counsel, which included four law firms. 1993 WL 58428, at *8. The Court rejected plaintiffs counsels' fee application noting that (1) an award of attorneys fees are only appropriate "to the extent that the work performed by class counsel confers a benefit on the class."; (2) much

of the requested fees were incurred in activities that were of no or minimal benefit to the class; and, (3) much of the ultimate benefit of the settlement resulted from efforts of others than Plaintiff Class Counsel.  Id. at *8.  In this case, Class Counsel rode the coat-tails of the NYAG to overcome motions to dismiss, and they have only conferred a benefit of less than $79.8 million on the class.[7]  Moreover, although Class Counsel in their application to this Court failed to give detailed time records (another flaw in their fee application), it is clear that they spent thousands of billable hours doing duplicative work that was of little value to the class, when the Government had already reviewed the 14 million pages of Defendants' productions, identified the crucial and important documents, and provided a roadmap of Defendants' alleged misconduct.

Here, $140 million of the settlement fund was already on the table, offered by the Ivy Defendants as a result of the NYAG investigation and offered before the class plaintiffs entered the mix.  Now, with the skill and contribution of Class Counsel, along with the continued efforts of the NYAG, DOL and Fund Counsel, Defendants have agreed to settle this case for $219,857,694.  Ergo, Class Counsel's maximum benefit conferred to the class is $79,857,694, less the portion attributable to the work of the NYAG, DOL and Fund counsel — not the entire value of the common fund.  Class Counsel are not entitled to a percentage of the entire common fund, which cannot be attributed to their efforts.

---

[7]     The difference between the ultimate settlement of $219.8 million and the $140 million that was on the table is approximately $79.8 million.  Class Counsel's benefit conferred upon the class is the $79.8 million, less the benefit that can be attributed to the NYAG's, DOL's, and Funds' continued participation in the litigation and mediation.

**POINT III.**

**THE GOLDBERGER FACTORS WEIGH
AGAINST CLASS COUNSELS' APPLICATION**

Under <u>Goldberger</u>, the very decision which Class Counsel concedes articulates the standard for its fee application, Class Counsel's fee application must be rejected. Not only is <u>Goldberger</u> the leading case on the reasonableness of class counsel fees, but <u>Goldberger</u> is factually on point. In <u>Goldberger</u>, class counsel sought a fee of 25% of the $54 million settlement, but the court instead awarded only 4%, or $2.1 million dollars because the case was aided by government investigation and posed very low risk for class counsel. 209 F.3d at 44.

<u>Goldberger</u> involved allegations that Michael Milken of Drexel Burnham Lambert Group touted junk bonds to finance otherwise under capitalized companies. <u>Id.</u> at 45. Milken clients depended on him to sell their high risk bonds to so called "daisy chain" of other Milken controlled clients. <u>Id.</u> Eventually, the pyramid fell apart when the market realized that the junk debt carried higher default rate than had been advertised. <u>Id.</u> Criminal and civil enforcement actions were initiated, and Milken pleaded guilty to federal securities fraud and agreed to pay hundreds of millions in fines and restitution. <u>Id.</u> Indeed, Bernie Madoff is the Michael Miken of our day. The defendant in <u>Goldberger</u> was a financial services company that was allegedly part of the daisy chain. <u>Id.</u> Just like Ivy is a financial services company — owned by Bank of New York — that became involved in Madoff's fraud.

Following a settlement in a securities class action in <u>Goldberger</u>, the S.D.N.Y. awarded plaintiff's counsel only 4% of the recovery. <u>Id.</u> at 53. The Second Circuit held that the SDNY did not abuse its discretion by declining to apply a multiplier to lodestar, because counsel had benefited from information generated by various parallel federal investigations, there was no

**POINT III.**

**THE GOLDBERGER FACTORS WEIGH
AGAINST CLASS COUNSELS' APPLICATION**

Under <u>Goldberger</u>, the very decision which Class Counsel concedes articulates the standard for its fee application, Class Counsel's fee application must be rejected. Not only is <u>Goldberger</u> the leading case on the reasonableness of class counsel fees, but <u>Goldberger</u> is factually on point. In <u>Goldberger</u>, class counsel sought a fee of 25% of the $54 million settlement, but the court instead awarded only 4%, or $2.1 million dollars because the case was aided by government investigation and posed very low risk for class counsel. 209 F.3d at 44.

<u>Goldberger</u> involved allegations that Michael Milken of Drexel Burnham Lambert Group touted junk bonds to finance otherwise under capitalized companies. <u>Id.</u> at 45. Milken clients depended on him to sell their high risk bonds to so called "daisy chain" of other Milken controlled clients. <u>Id.</u> Eventually, the pyramid fell apart when the market realized that the junk debt carried higher default rate than had been advertised. <u>Id.</u> Criminal and civil enforcement actions were initiated, and Milken pleaded guilty to federal securities fraud and agreed to pay hundreds of millions in fines and restitution. <u>Id.</u> Indeed, Bernie Madoff is the Michael Miken of our day. The defendant in <u>Goldberger</u> was a financial services company that was allegedly part of the daisy chain. <u>Id.</u> Just like Ivy is a financial services company — owned by Bank of New York — that became involved in Madoff's fraud.

Following a settlement in a securities class action in <u>Goldberger</u>, the S.D.N.Y. awarded plaintiff's counsel only 4% of the recovery. <u>Id.</u> at 53. The Second Circuit held that the SDNY did not abuse its discretion by declining to apply a multiplier to lodestar, because counsel had benefited from information generated by various parallel federal investigations, there was no

groundbreaking issue which loomed significant, and likelihood of non-payment was slim. Id.

The Second Circuit explained:

> [T]he district court found that, from counsel's perspective, this was **a "promising" case, with almost certain prospects of a large recovery from solvent defendants**. The court reasonably concluded that enhancing fees above the already generous rates included in the lodestar "would likely result in [counsel's] overcompensation." This conclusion rested on the specific findings that: **(1) counsel benefitted from the spadework done by federal authorities during the criminal and civil actions brought against Drexel and Milken; (2) "[t]here was no groundbreaking issue which loomed significant in this case;"** (3) despite the Drexel and Integrated bankruptcies, **the likelihood of non-payment was slim, because "[m]ost of the defendants ... were solvent, well established individuals or entities," and the Integrated directors and officers were the beneficiaries of an insurance policy**; (4) use of current hourly billing rates compensated counsel for delay in payment; and (5) use of high hourly billing rates compensated counsel for the quality of their efforts, and what risk there was in the case.

Id. at 53-54 (emphasis added).

This Court need not look beyond Goldberger to determine that this case was extremely promising for Class Counsel from the outset with prospects of a large recovery from solvent defendants. Indeed, analysis of each of the Goldberger criteria: (1) the risk of litigation; (2) the magnitude and complexities of the litigation; (3) the time and labor expended by counsel; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations, reveals that Class Counsel's fee application is unreasonable and must be denied.

## A. There was No "Risk of Litigation"

The risk of litigation for class counsel is the "most significant" factor in determining the reasonableness of attorneys' fees. Velez, 2010 WL 4877852, at *19. As set forth below, here,

Class Counsel had virtually <u>no</u> risk whatsoever in pursuing this litigation.[8]  Where there is great risk, there is great reward.   Conversely, where there is little risk, the reward should be commensurate.

Indeed, securities class actions that involve government investigations are low risk because the class is aided by the spadework of regulatory agencies and by the additional pressures upon defendants.  <u>In re Renaissance Holdings Ltd. Sec. Litig.</u>, 05-Civ. 6764(WHP), 2008 WL 236684, at *5 (S.D.N.Y. Jan. 18, 2008) (class counsel's risks are "fairly low" because "all but a small percentage of securities class actions result in settlements", and in addition, the risk of non-recovery was particularly small here because the Complaint was filed after federal investigations were commenced); <u>In re Elan Sec. Litig.</u>, 385 F. Supp. 2d 363 (S.D.N.Y. 2005) (the "foremost factor" of the risk to counsel of pursuing the case on a contingency basis was modest when the SEC commenced a parallel proceeding and the "existence of a parallel SEC investigation would certainly have put additional pressure on [Elan] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail."); <u>In re Painewebber Ltd. P'ships Litig.</u>, 999 F. Supp. 719 (S.D.N.Y. 1998) (while class counsel did not directly piggy back on SEC efforts, they did refer to the SEC investigation in the Amended Complaint and the risk in litigating class members' claims was substantially reduced by pressure placed on Defendant by the SEC).

---

[8]      It is noteworthy that counsels Max Folkenflik and Anthony B. Gordon, and perhaps others too, were individually retained in this action, by their respective clients, and <u>their legal fees were paid</u> on an ongoing basis.  Folkenflik Decl. ¶ 7, Gordon Decl. ¶ 8.  Yet, Class Counsel have improperly included Mr. Folkenflik's and Mr. Gordon's fees in its application for attorneys fees and expenses.  <u>See</u> Hart Decl. ¶¶ 94, 97. Furthermore, none of the counsel provided copies of their retainer agreements in connection with their fee application so it is not possible to know whether their fees were capped in any way or manner.

Moreover, a case that stems from a notorious matter, that was widely investigated, and involved deep pocket defendants is particularly low risk for class counsel. First, this case arose from a notorious financial fraud. <u>See</u> <u>In re Dreyfuss Aggressive Growth Mut. Fund Litig.</u>, No. 98 CV 4318 HB, 2001 WL 709262, at *5 (S.D.N.Y. June 22, 2001) (merits of the case are promising from the outset when the defendants alleged misdeed are widely discussed in the investment community). Second, the government's efforts — both the NYAG and the DOL — dramatically increased the chances of success in the litigation. <u>See</u> <u>In re Bausch & Lomb, Inc. Sec. Litig.</u>, 183 F.R.D. 78, 87 (W.D.N.Y. 1998) (even though the original class complaint predated the SEC investigation, the existence of the SEC investigation certainly put additional pressure on defendants to settle, and the class plaintiffs twice amended their complaint and referenced the SEC investigation). Third, the case involved a deep-pocket defendant — Ivy, which is owned by the Bank of New York. For these reasons, the litigation was very low risk to Class Counsel, and the most significant factor in evaluating reasonable fees weighs against approving Class Counsel's fee application.

### B. The Case Did Not Present Novel Issues

While securities litigation and ERISA litigation is generally complex, a court must evaluate the complexity of a case in comparison to similarly complex cases. <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005). The standard is not whether this action involved complex issues, but rather whether this case was remarkable when compared with other securities actions in terms of whether it presented overly complex or novel questions of law or fact. <u>Hall v. Children's Place Retail Stores, Inc.</u>, 669 F. Supp. 2d 399, 402 (S.D.N.Y. 2009). Although class counsel may have defended motions to dismiss, engaged in substantial discovery and successfully certified a class, as well as dealt with issues of materiality, scienter,

reliance and loss causation, these are ordinary hurdles in securities litigations and do not warrant an extraordinary fee award.  Id.  Class Counsel has argued that it faced significant risks including establishing scienter, fiduciary status, reliance and damages in this case.  Br. p. 22.  Contrary to Class Counsel's contention, these "difficult and complex" issues, are nothing but ordinary in securities litigations.

## C.   Time and Labor Expended by Counsel was Excessive

Class Counsel has submitted to the Court hundreds of pages of declarations establishing that Class Counsel collectively contributed over 118,000 hours to litigating these actions.  Br. p. 21.  While it is self-evident that Class Counsel invested a considerable amount of time and labor litigating these actions, it is appropriate to consider whether the claimed hours appear excessive and whether they were spent in ways that suggest inefficiency or inappropriate staffing.  Fears v. Wilhelmina Model Agency, No 02 Cv 4911(HB), 2009 WL 2958396, at *6, 315 Fed. Appx. 333 (2d Cir. 2009).  Moreover, this Court has expressly cautioned class counsel in other cases that it will not award duplicative fees for duplicative work done by multiple law firms.  Jermyn v. Best Buy Stores, No. 08 Civ. 214 (CM), 2011 WL 280798, at *1 (S.D.N.Y. Jan. 18, 2011) (McMahon, J.) (granting motion to add additional class counsel but ordering: "class counsel are advised that this court will not award what it views as duplicative fees for work performed at multiple law firms. That includes having lawyers at three law firms review briefs and motions. I intend to keep class counsel fees to a minimum in the event there is a recovery in this lawsuit. Counsel should act accordingly."); see also In re AOL Time Warner Shareholder Derivative Litig., No. 02 Civ. 6302(CM), 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) (adopting special masters report which adjusted attorney's time downward, despite the laudable services they rendered, because of excesses which were attributable to the pressures and time

constraints of oversized litigation, the inevitable inefficiencies in large cases, the interaction among large numbers of lawyers, and the desire of senior lawyers to shepherd the case through to conclusion).

Class counsel has not provided the Court with contemporaneous time records as required in this Circuit.  See New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 114, 1154 (2d Cir. 1983).  Therefore, the Funds are unable to ascertain with certainty whether Class Counsel engaged in duplicative, inefficient and unnecessary work.  However, the telltale signs of such inefficiencies are present.

Specifically, Class Counsel have identified over 110 attorneys and over 67 paralegals and staff that worked on these matters.  Over 20 lawyers representing the class attended multiple days of mediation and often over a dozen class lawyers attended court conferences.  Class Counsel have submitted no evidence to overcome the presumption that these actions were highly overstaffed and attorneys and paralegal engaged in overlapping and duplicative work.  See In re Bausch & Lomb, 183 F.R.D. at 87 ("Equally troubling is the sheer number of attorneys involved in this case. Based on the records submitted by plaintiffs' counsel, it appears that sixty-six attorneys and at least twenty-one paralegals have worked on this case. While I recognize that the nature of this class action necessitated the use of multiple attorneys, sixty-six is still a very high number of lawyers for a single case that never even reached the summary judgment stage, much less an actual trial.").  In fact, in this case, the NYAG attorneys spent only 6,000 attorney hours to review over 11 million pages of discovery, prepare 30 document and information requests to fourteen entities, and conduct 37 depositions, and draft and file the Complaint, and participate in the litigation and mediation proceedings — Class Counsel spent 118,000 or 20 times the amount

of time even though the difficult work of demonstrating and proving Ivy's alleged misconduct was all done by the NYAG!

Additionally, in this case, partners with high billing rates, upwards of $700 and $800, billed thousands upon thousands of hours. Class Counsel have submitted no evidence to overcome the presumption that partners were doing work that could have been delegated to more junior attorneys. See Beane v. Bank of N.Y. Mellon, No. 07 Civ. 09444(RMB), 2009 WL 874046, at *8 (S.D.N.Y. Mar. 31, 2009) ("Class Counsel 'fail[ed] to delegate work to junior, less expensive attorneys [and this is] grounds for reducing [the] award of attorney's fees.'"). Class Counsel have also improperly charged 2012 billing rates for the entire 118,000 hours, when the work in these cases began in 2009. Carey, 711 F.2d at 1153 (holding that historic rates should be used in setting fee awards in multi-year cases to avoid windfall awards); In re Painewebber Ltd. P'ships Litig., 94 Civ. 8547 (SHS), 2003 WL 21787410, at *3 (S.D.N.Y. Aug. 4, 2003) (same). Finally, time and labor spent reviewing million pages of discovery, when the NYAG had already reviewed and had identified key documents, was inefficient and duplicative. While the Court is not required to nit-pick through Class Counsel's fee application and do a line-by-line review, in this case, Class Counsel have not presented a compelling submission that the 118,000 hours were necessary and efficient.

### D.  Fee Request is Disproportionate to the Benefit Conferred

Class Counsel's fee application should be denied because awarding Class Counsel $41 million would "swallow up" over 50% of the maximum valued added by Class Counsel to the settlement. Goldberger requires that this Court consider the requested fee in relation to the settlement achieved. Goldberger, 209 F.3d at 50. Indeed, any award of attorneys fees from the common fund necessarily diminishes the class's recovery. Fears, 2009 WL 2958396, at *8. In

this case, however, Class Counsel should not be entitled to recover over 50% of the benefit they conferred upon the class, and thereby so significantly diminish the class recovery in relation to their contribution as set forth in detail in Point II above. See Point II, supra.

      **E.**      **Public Policy Favors Maximum Recovery to the Class Itself**

In determining reasonable attorneys fees, a court must act as a fiduciary and guardian of the rights of the class members. Goldberger, 209 F.3d at 52 (citing City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1099 (2d Cir. 1977)). In a typical securities class action, a strong public policy concern exists for rewarding firms for bringing successful securities litigations. In re Top Tankers, Inc. Sec. Litig., 2008 WL 2944620, at *16. This case, however, is different. While public policy generally weighs in favor of awarding fees when the class would have received nothing but for the risk and efforts of class counsel, here, regulatory agencies had already done the heavy lifting and the investor class members were likely to have recovered monies from a settlement with the Ivy Defendants, even without the efforts of class counsel at all. Cf. Guippone, 2011 WL 5148650, at *12 (McMahon, J.) (public policy weighs in favor of granting attorneys fees request when "but for the work of Class Counsel and their willingness to bear the entire risk of bringing this litigation to fruition, Class Members likely would receive nothing on their claims"). In consideration of public policy, this Court should reject Class Counsel's fee application and acknowledge that this is a case in which Class Counsel rode the coat-tails of government regulators, they should not receive a windfall award for a no risk litigation and for a class recovery that at least, in part, would have been reach even without the class actions. See In re Gulf Oil/Cities Serv., 142 F.R.D. 558, 597 (S.D.N.Y. 1992).

**F.  Class Counsel Provided Quality Representation But Did Not Achieve Extraordinary Results**

To determine quality of representation, the final <u>Goldberger</u> criteria, courts review the recovery obtained and the backgrounds of the lawyers involved.  <u>Johnson v. Brennan</u>, No. 10 Civ. 4712 (CM), 2011 WL 4357376, at *18 (S.D.N.Y. Sept. 16, 2011).  Class Counsel's skill and experience indeed contributed toward this consolidated settlement.  The Funds acknowledge that the lead attorneys who represented the interests of the class are talented lawyers with expertise in the areas of securities and ERISA litigation. (The Funds cannot comment on all 110 attorneys).  But the tremendous skill and vigorous efforts of Class Counsel do not change the reality that Class Counsel conferred a benefit of less than $80 million on the class.  For this reason, the recovery obtained for the class is not extraordinary, and the fees awarded should fairly reflect the benefit conferred by Class Counsel.

**G.  Lodestar Cross-Check is Unreliable**

The lodestar cross-check is unreliable in this case.  The lodestar cross-check is typically used to ensure the reasonableness of the award.  <u>Goldberger</u>, 209 F.3d at 50.  However, the amount of time reasonably contributed to this case is in fact determinable by means other than the lodestar cross-check.  Here, the NYAG attorneys spent only 6,000 attorney hours to review over 11 million pages of discovery, prepare 30 document and information requests to fourteen entities, and conduct 37 depositions, and draft and file the Complaint, and participate in the litigation and mediation proceedings — as such, there is simply no valid basis for using 118,000 attorney hours to cross-check the reasonableness of attorneys fees when the hours themselves are clearly excessive.  <u>See</u> <u>Fears</u>, 2009 <u>WL</u> 2958396, at *6; <u>In re KeySpan Corp. Sec. Litig.</u>, No. 01 CV 5852 (ARR), 2005 WL 3093399, at *17 (E.D.N.Y. Sept. 30, 2005) ("Because the lodestar calculation of Class Counsel is, at best, inflated, its use as a cross check of the reasonableness of

the fee award is of limited usefulness."). The fact that the NYAG, which developed and disclosed to all Ivy's alleged fraudulent conduct, spent 6,000 attorney and paralegal hours, in total, litigating this case, and that Class Counsel spent a whopping 118,000 is convincing evidence that Class Counsel's hours billed to this matter are patently unreasonable.

## POINT IV.

## CLASS COUNSEL ARE NOT ENTITLED TO THE EXPENSE REIMBURSEMENTS SOUGHT

Ordinarily, it is well accepted that counsel is entitled to reimbursement of expenses that they advanced to the class. Indeed, courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course, so long as documentation is adequate. In Re Flag Telecom Holdings, Ltd. Sec. Litig., No. 02-cv-3400(CM)(PED), 2010 WL 4537550, at *30 (S.D.N.Y. Nov. 8, 2010). As an initial matter, several firms include a line item expense for the "litigation fund" to which several firms contributed over $318,000, used to pay a variety of expenses. Hart Decl. ¶¶ 109, 110. Class Counsel have not established that the $318,000 in expenses are not reflected twice in their application, once as the fund contribution and once as the underlying expense. The expense application suffers from several other inadequacies as well. First, all of the expense entries are unsubstantiated. Second, entries like "other computer services" and "miscellaneous" are overly vague. Third, expenses for office supplies, publications, stationary, and storage are ordinary overhead. Fourth, some entries appear excessive, such as the collective tens of thousands of dollars spent on photocopying (for both inside and outside vendors). There is no dispute that Class Counsel incurred great expense in litigating this consolidated action. While the Funds do not suggest that the excruciating exercise of verifying each and every expense is required, at a minimum, Class Counsel cannot double charge for expenses by including charges for individual expenses incurred as well as for the

litigation fund from which some expenses were paid. Additionally, seemingly excessive expenses should be reviewed for reasonableness.

## <u>CONCLUSION</u>

For the reasons set forth above, the Funds respectfully requests that this Court: (1) approve the final settlement and plan of allocation; (2) deny Private Plaintiff's application for awards of attorneys' fees and expenses; and (3) limit Class Counsel's award of attorneys' fees to a reasonable percentage of $79.8 million, less amounts attributable to the NYAG, DOL, and the Funds' continued participation in the action and mediation ; and (4) provide all such other relief as the Court may find just and proper.

Dated: New York, New York
       February 8, 2013

**HERRICK, FEINSTEIN LLP**

By: <u>s/ Arthur G. Jakoby</u>
Arthur G. Jakoby
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for*
*Beacon Associates LLC I,*
*Beacon Associates LLC II,*
*Andover Associates LLC I and Andover*
*Associates QP LLC*